# A F F I D A V I T

**STATE OF WEST VIRGINIA**
**COUNTY OF KANAWHA, to-wit:**

I, Jonathan Vernon, being first duly sworn, do hereby depose and state as follows:

## INTRODUCTION

1.  I am a Task Force Agent with the Drug Enforcement Administration (hereinafter "DEA") and have been since December 2017. I have been employed by the Kanawha County Sheriff's Office for over 18 years. From approximately March 2016 until present, I have been assigned to the Kanawha County Sheriff's Office (hereinafter "KCSO") Sheriff's Tactical Operations Patrol Team (hereinafter "S.T.O.P." ) in Kanawha County, West Virginia.

2.  I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 for a search warrant to search 434 58th Street, Charleston, West Virginia (hereinafter referred to as the "SUBJECT PREMISES") more fully described in Attachment "A".

3.  As set forth herein, probable cause exists that Jonathan Fitzpatrick has committed and continues to commit violations of the following offenses: (i) possession with intent to distribute controlled substances in violation of 21 U.S.C. Section 841(a)(1); and (ii) conspiracy to distribute controlled substances in violation of 21 U.S.C. Section 846. Further, probable cause exists that evidence, proceeds, and fruits and instrumentalities of those offenses are currently located within the SUBJECT PREMISES more particularly described in Attachment A.

4.  The contents of Attachment "A," and Attachment "B," to this Affidavit and application for a search warrant are hereby incorporated by reference.

5.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, cooperating sources and witnesses.

6.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for this warrant.

### AFFIANT'S TRAINING AND EXPERIENCE

7.      I have been a Task Force Officer (hereinafter "TFO") with the Drug Enforcement Administration (hereinafter "D.E.A") Task Force, of Charleston, West Virginia, from December 2017 to present.

8.      As a TFO, I am charged with enforcing the Controlled Substances Act, Title 21, United States Code, et. seq., the West Virginia Uniform Controlled Substance Act and other duties as imposed by law.

9.      Prior to being assigned to the D.E.A. Task Force, I was assigned to the KCSO S.T.O.P. Team.   In addition, I was assigned to the KCSO Road Patrol for over 10 years. During my assignment on the D.E.A. Task Force, S.T.O.P. Team and Road Patrol, I investigate/have investigated street level and higher level drug offenses in uniform and in a plain clothes capacity.

10.     I have received investigative training, and conducted and participated in investigations of violations of federal criminal laws, including those related to controlled substances and firearms. These acts commonly involve the criminal use and transfer of illicit drug trafficking and the possession, use and transfer of firearms.

11.     In my current position as a DEA TFO, my primary responsibilities include investigating individuals or groups who have committed violations of narcotics laws and firearms offenses.  Within that role, my job duties include, but are not limited to:

    a.   Functions as a case agent, which entails the supervision of specific investigations;

    b.   Interviewing witnesses relative to the illegal trafficking of drugs and firearms and the distribution of monies and assets derived from these illegal acts;

    c.   Functioning as a surveillance agent observing and recording movements of persons trafficking in drugs and firearms and those suspected of trafficking in drugs and firearms; and,

    d.   Drafting, obtaining, and executing search warrants.

## Probable Cause

12.     On or about May 17, 2024, your affiant secured the assistance of a cooperating source (hereinafter "CS").   The CS told your affiant that he/she had purchased pounds of methamphetamine from Jonathan Fitzpatrick (hereinafter "FITZPATRICK") beginning at or near December 2022. The CS further stated during calendar year 2023 and the beginning of 2024, that he/she had obtained "pounds" of methamphetamine from FITZPATRICK on approximately 15-20 separate occasions. The CS stated that he/she last obtained 5-7 pounds of methamphetamine from FITZPATRICK in early April 2024. The CS further stated that FITZPATRICK normally "fronted" him/her the methamphetamine and traditionally charged him/her $1800 per pound, but recently FITZPATRICK had increased the price to $2200 per pound. The CS stated that FITZPATRICK and his wife, Brandi Fitzpatrick, live beside the Pratt Police Department, in Pratt, Kanawha County, West Virginia. The CS further indicated that he/she has not talked/communicated with FITZPATRICK since in or near early April 2024.

13.     The CS further stated that traditionally FITZPATRICK would "front" her pounds of methamphetamine and he/she would pay him the amount he charged per pound after he/she distributed the methamphetamine that he provided him/her.  Your affiant knows that "fronting" controlled substances is a common term to mean that drugs are provided up front with the understanding that they will be paid for once they are distributed by the seller for cash.   The CS said that he/she usually physically received the methamphetamine directly from FITZPATRICK at the back door of his residence located at 406 Pratt Avenue, Apartment 7, Pratt, West Virginia. Further, the CS said FITZPATRICK would often meet him/her at locations in the Pratt area while driving his Dodge Ram truck, whereupon the CS would deliver FITZPATRICK cash for drug debts owed while FITZPATRICK remained in the truck or briefly stepped out of the truck.

14.     Through surveillance, witness interviews and other investigative techniques, your affiant identified FITZPATRICK as residing at 406 Pratt Avenue, Apartment 7, Pratt, West Virginia, 25162.  Further your affiant has independently learned that FITZPATRICK lives at the apartment with Brandi Fitzpatrick, who is believed to be his wife.   In addition, through surveillance, record requests and other investigative techniques, your affiant determined that FITZPATRICK drives a black 2013 Dodge Ram (hereinafter "Dodge Ram") 1500, bearing West Virginia registration 2ZR153.  The Dodge Ram is registered to Brandi Fitzpatrick.  In addition, during the course of the investigation, your affiant and other law enforcement officers have seen FITZPATRICK driving the Dodge Ram and not any other vehicle.

15.     On May 24, 2024, at approximately 4:45 p.m., your affiant and Detective T. Hannon (hereinafter "Detective Hannon") with the 119 Task Force, met with the CS to make a recorded phone call to FITZPATRICK.  At the time, the CS showed your affiant text messages

4

from FITZPATRICK that showed FITZPATRICK wanted to speak with the CS and arrange a possible meeting.

16.     The CS proceeded to conduct a recorded call with FITZPATRICK that was directed and monitored by your affiant. FITZPATRICK initially acted wary of the CS since the CS had not been in contact with FITZPATRICK for an extended period. FITZPATRICK said, "I just want to make sure you're on point again. You know what I mean.  I know you were sick and everything, but that really fucked me up for a while." The CS responded, "And I'm sorry.  I didn't mean to do that.  Haven't I always been there for you?  Just like you've been there for me."  Fitzpatrick responded, "Pretty much. That's why I'm not X-ING you out. The CS responded, "Exactly."  A short time later, FITZPATRICK told the CS, "Exactly.  Let's be there again." The CS asked FITZPATRICK how many pounds of methamphetamine he currently had available. The CS specifically asked, "What's my number?" FITZPATRICK told the CS that 3 or 4 pounds of methamphetamine were currently available, but that he could provide the CS with additional pounds if the CS gave him cash. FITZPATRICK specifically said, "I got either 3 or 4 right now, unless you want to give me something to work with and I can get you what you need." During the conversation, FITZPATRICK further told the CS that the current price for a pound of methamphetamine was $2300. FITZPATRICK specifically stated, "I'm doing them at 23.  That's the only way I can make any money now." Your affiant listened to the conversation in its entirety and represents that the foregoing is not intended to be an official transcript, but accurately depicts relevant portions of their conversation. Your affiant further confirmed with the CS that the foregoing accurately depicts relevant portions of their conversation.

17.     Subsequently, on May 24, 2024, FITZPATRICK called the CS outside the presence of your affiant or other law enforcement officer. However, the CS recorded the

conversation and your affiant has listened to the conversation in its entirety. During the recorded call, FITZPATRICK asked the CS how many pounds of methamphetamine the CS needed. Specifically, FITZPATRICK asked, "What are you needing anyway?" The CS responded, "Same old stuff. I was going to pick it up if you still had it." FITZPATRICK responded, "I need to get some more. How many do you want?" The CS then told FITZPATRICK that he/she could handle as much as 10 pounds of methamphetamine. Specifically, the CS said, "You know what I do. You know, up to 10 or whatever you've got." FITZPATRICK responded, "Well, I've got a few you can have but not here at my house. Let me hit you up in a little bit. You can come grab them tomorrow, though, is that cool?" The CS responded, "Yeah. That's cool." FITZPATRICK told the CS that if he/she wanted more than 3 or 4 pounds of methamphetamine, he would welcome him/her to "front" him the money. FITZPATRICK specifically told the CS, "If you need more, I need some cash." The CS responded, "Ok." Your affiant represents that the foregoing is not intended to be an official transcript of the conversation, but accurately depicts relevant portions of their conversation. Your affiant further confirmed with the CS that the foregoing accurately depicts relevant portions of their conversation.

18.     On May 25, 2024, at approximately 7:00 p.m., the CS proceeded to initiate another recorded call with FITZPATRICK that was directed and monitored by your affiant. During the conversation, FITZPATRICK told the CS that he wanted to meet with him/her and talk. The CS agreed to meet FITZPATRICK at a known location identified during the conversation. Your affiant listened to the conversation in its entirety.

19.     After the recorded conversation, in anticipation of the CS meeting with FITZPATRICK, your affiant and Detective Hannon searched the CS and the CS's vehicle. No illegal drugs or contraband were found. The CS was equipped with an audio/video recorder. In

addition, the CS was given $6,920 in pre-recorded buy money to prepare for the contingency that FITZPATRICK was prepared to consummate the transaction with the CS that they had earlier discussed for three (3) pounds of methamphetamine at a price of $2300 per pound. The undersigned affiant and Detective Hannon followed the CS to the meet location in an undercover vehicle. In addition, law enforcement engaged aerial surveillance in a further effort to capture and record FITZPATRICK"S meeting with the CS.

20.     At approximately 7:54 p.m., law enforcement officers observed FITZPATRICK pull into the prearranged meet location driving the Dodge Ram. Law enforcement officers further saw - and positively identified - FITZPATRICK get out of the Dodge Ram and hug the CS. Brandi Fitzpatrick was also observed sitting in the front passenger seat of the Dodge Ram where she remained through FITZPATRICK'S meeting with the CS. During their conversation, FITZPATRICK expressed his concern to the CS about recent rumors of suspected law enforcement involvement with individuals associated with their drug trafficking operation. It should be noted, the CS previously identified to your affiant the individuals FITZPATRICK discussed as subordinate members of their drug trafficking operation. FITZPATRICK specifically wanted to address a rumor that he had heard about the CS' possible involvement with law enforcement. The CS adamantly denied having any involvement with law enforcement and further told FITZPATRICK that he/she intended to confront a specific member of the operation who FITZPATRICK said was responsible for the rumors he had heard.

21.     The conversation returned to FITZPATRICK supplying the CS with methamphetamine. FITZPATRICK told the CS that the CS would have to bring him "some money" because "they got rid of the load last night." FITZPATRICK further told the CS that once the CS provided him with money for the methamphetamine, his source could supply him

with methamphetamine quickly.  Specifically, FITZPATRICK said, "That shit's ready to go.  As soon as you get it to over to me, it won't be that two week shit or one week shit." Law enforcement observed FITZPATRICK return to the Dodge Ram truck and leave.

22.     The CS returned to his/her vehicle and met your affiant and Detective Hannon at a prearranged location. The CS surrendered the $6,920 in pre-recorded currency, as well as the audio/video recording equipment. Your affiant and Detective Hannon searched the CS and the CS's vehicle and confirmed both were free of illegal drugs or contraband. Your affiant took a statement from the CS regarding the conversation that occurred with FITZPATRICK. The CS confirmed that FITZPATRICK was wary of the CS due to rumors being spread. The CS said that FITZPATRICK needed to confirm with the CS that everything was normal in their long standing business relationship. The CS further confirmed that FITZPATRICK told him/her that he was currently out of methamphetamine, but welcomed the CS to provide him with cash the following day and his source would quickly act in order to resupply the CS with methamphetamine. Your affiant listened to the audio/video recording in its entirety and represents that the foregoing is not intended to be an official transcript of the conversation, but accurately depicts relevant portions of their conversation. Your affiant further confirmed with the CS that the foregoing accurately depicts relevant portions of their conversation.

23.     On May 26, 2024, your affiant and Detective Hannon met with the CS for the purpose of providing $10,000 to FITZPATRICK for the purpose of purchasing methamphetamine. At approximately 7:15 p.m., the CS initiated a recorded phone call to FITZPATICK that was directed and monitored by the undersigned.   During the call, the CS told FITZPATRICK, "I'm going to run up and see you real fast." FITZPATRICK responded, "What you got for me?" The CS told FITZPATRICK that he/she had cash to provide him for

methamphetamine. Specifically, the CS said, "You know what we were talking about yesterday." FITZPATRICK then asked the CS if he/she had $10,000. FITZPATRICK specifically asked the CS, "You got 10?   The CS stated, "Yeah." FITZPATRICK responded, "That'll work." The CS told FITZPATRICK that he/she was on his/her way to FITZPATRICK'S residence located at 406 Pratt Avenue, Apartment 7, Pratt, Kanawha County, West Virginia. Your affiant listened to the conversation in its entirety and represents that the foregoing is not intended to be an official transcript, but accurately depicts relevant portions of their conversation. Your affiant further confirmed with the CS that the foregoing accurately depicts relevant portions of their conversation.

24.     The undersigned and Detective Hannon searched the CS and the CS's vehicle. Both were free of illegal drugs or contraband. The CS was equipped with an audio/video recording device. Further, the CS was given $10,000 in United States Currency that was wrapped in a grocery style plastic bag.  The CS stated that he/she traditionally provided FITZPATRICK with $10,000 in denominations of only twenty dollar bills. Therefore, the $10,000 was comprised of only $20 bills. The serial number of each $20 bill was pre-recorded. Law enforcement officers established surveillance in the area of FITZPATRICK"S residence located at 406 Pratt Avenue, Apartment 7, Pratt, Kanawha County, West Virginia. Law enforcement officers also followed the CS as he/she drove to FITZPATRICK'S residence to consummate the money drop with FITZPATRICK. At approximately 7:26 p.m., the CS arrived at FITZPATRICK"S residence. While sitting in the driver's seat outside FITZPATRICK'S residence, the CS initiated a recorded call to FITZPATRICK to alert him that he/she had arrived. FITPATRICK said, "I'll walk out to you."

25.     Your affiant observed FITZPATRICK as he walked out of the back door of his residence, walked up to the passenger side door of the CS' vehicle and began talking to the CS through the open window. Almost immediately after FITZPATRICK arrived at the passenger side door, your affiant could hear a distinct sound, consistent with a plastic bag exchanging hands. The CS later confirmed at that time he/she provided FITZPATRICK with the bag that contained the $10,000 through the open passenger side window. Shortly after taking possession of the $10,000, FITZPATRICK told the CS that the wheels would soon be in motion for his source to supply him with methamphetamine.  FITZPATRICK specifically told the CS, "I'm hitting up my boy right now and we'll get this going for you." The CS asked FITZPATRICK when he/she could expect the delivery of methamphetamine. The CS specifically asked FITZPATRICK, "What are we looking at?  Tuesday, Wednesday, Thursday?"  FITZPATRICK responded, "Yeah. Hopefully Tuesday. I'm hoping for Tuesday or Wednesday. It will be quick. It won't be that long at all." FITZPATRICK turned and returned to his house with the $10,000 and the CS began driving to a prearranged location to meet with your affiant and Detective Hannon.   In addition, FITZPATRICK'S black Dodge Ram truck was seen parked by his residence.

26.     As the CS was leaving FITZPATRICK'S residence in his/her vehicle, the CS initiated a recorded call to FITZPATRICK because FITZPATRICK had told the CS that the CS would have to pick up the methamphetamine when it arrived at a residence in Charleston, West Virginia, and not his residence in Pratt, West Virginia, where prior transactions occurred. During the recorded call, the CS said to FITPATRICK, "What the hell is up with us going to Charleston?  I meant to ask you that?" FITZPATRICK explained that he recently had 11 pounds of methamphetamine stolen. Specifically, FITZPATRICK said, "We got a guy over here who

steals shit. I took a hit recently for 11p's. FITZPATRICK further explained during the recorded call, "Yeah. He got taken care of and I can't just have anything over here anymore. So I rent a house whenever we do a deal over there and you meet me at the rented house. So that way I don't have to deal with this dumb motherfucker, you know." A short time later the call concluded. The CS arrived at the prearranged location and met with your affiant and Detective Hannon. The CS turned over the audio/video recording device. The undersigned and Detective Hannon again searched the CI and the CI's vehicle. Both were free of illegal drugs or contraband. In addition, the affiant listened to the above-referenced recorded phone call between the CS and FITZPATRICK in its entirety and represents that the foregoing is not intended to be an official transcript, but accurately depicts relevant portions of their conversation. Your affiant further confirmed with the CS that the foregoing accurately depicts relevant portions of their conversation.

27.     Your affiant further received a statement from the CS. The CS confirmed that he/she met with FITPATRICK as he stood outside of the open passenger window of the CS' vehicle. The CS further confirmed that FITZPATRICK had taken the $10,000 in the plastic grocery style bag. The CS further confirmed that FITZPATRICK had walked away from the CS' vehicle and had taken the $10,000 back to his residence.

28.     At approximately 8:26 p.m., on May 26, 2024, the CS received a text from FITZPATRICK. The text message stated that he had been in contact with his "boy" and due to Memorial Day holiday, the methamphetamine would be slightly delayed but that he expected it before May 31, 2024. Your affiant reviewed the text message and represents that the foregoing fairly represents its substance.

29.     On or about May 30, 2024, FITZPATRICK texted the CS the following message, "So we're hoping for tomorrow or Saturday. I'm gonna talk to my boy right now and see what's up. He did tell me we're going for by Saturday so."   Your affiant reviewed the text message in its entirety.

30.     On May 31, 2024, the CS received a phone call from FITZPATRICK that the CS recorded.  FITZPATRICK asked the CS what time he/she got off work on Saturday, June 1, 2024.  Your affiant has listened to the call in its entirety.   The CS told FITZPATRICK that he/she got off of work at 3:00 p.m.   FITZPATRICK then said, "How about around that time can you meet me in Kanawha City and grab something?"  The CS responded, "Yeah. Sure can." FITZPATRICK finished the call by saying, "Ok.  We should be good to go then."   On June 1, 2024, the undersigned and other law enforcement officers observed FITZPATRICK'S Dodge Ram truck parked in front of a residence in Kanawha City located at 434 58th Street, Charleston, West Virginia.

31.     Your affiant and other law enforcement officers established surveillance in the area of 434 58th Street, Charleston, West Virginia, because it was believed that FITZPATRICK was prepared to consummate the methamphetamine transaction with the CS.  Your affiant and Detective Hannon met with the CS at approximately 2:45 p.m. to prepare the CS to participate in the drug transaction with FITZPATRICK. However, at approximately 4:12 p.m., the CS received the following text message from FITZPATRICK, "Not sure exactly what's going on had a small issue it'll probably be Monday.  We're not 100% sure but I will let you know that just what it's looking like right now."  Your affiant reviewed the text message in its entirety. Shortly after receiving the text message, FITZPATRICK was observed returning to his Dodge Ram truck from the residence at 434 58 Street, Charleston, West Virginia, and leaving the area.

32.     On June 3, 2024, FITZPATRICK contacted the CS and arranged to meet the CS at approximately 5:00 p.m.   At approximately 5:00 p.m., FITZPATRICK provided the meet location by texting the CS the following address, "434 58 street SE, Charleston." At or near 5:00 p.m., your affiant equipped the CS with an audio/video recording device. Further, the affiant and Detective Hannon searched the CS and his/her vehicle and found that both were free of illegal drugs or contraband.   Your affiant followed the CS in his/her vehicle to an area nearby 434 58th Street, Charleston, West Virginia.   FITZPATRICK'S Dodge Ram was observed arriving at the residence.  Brandi Fitzpatrick was observed sitting in the front passenger seat.  FITZPATRICK, Brandi Fitzpatrick and the CS went inside the residence.     A short time later, the CS walked out of the residence carrying a brown box.  The CS returned to his/her vehicle and placed the box in the vehicle.     The CS drove to a prearranged meeting location and met with your affiant. Approximately ten pounds of a crystal like substance was located in the aforementioned brown box.     The CS stated that FITZPATRICK provided her with the brown box containing the methamphetamine inside the residence. Shortly after the alleged drug transaction, FITZPATRICK texted the CS indicating that he had provide her with "10," which the CS stated referenced the amount of methamphetamine in the box in pounds.   The CS further stated that FITZPATRICK had fronted her approximately 5 to  6 pounds of methamphetamine and provided her with approximately 4 pounds of methamphetamine that he owed her in exchange for the earlier $10,000 payment.  In addition, it appeared approximately 10 pounds of methamphetamine was located in the box based on your affiant's observations.

33.     It should be noted that on or about every occasion the CS talked to FITZPATRICK by cellular phone or received a text message from FITZPATRICK in the course of your affiant's investigation as outlined here, FITZPATRICK used a cellular device assigned

phone number 681-532-2028. In response to a subpoena issued to T-Mobile, it was determined that cellular telephone number 681-532-2028 is subscribed to Jonathan FITZPATRICK.

## ITEMS TO BE SEIZED

1.     Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

2.     Individuals involved in narcotics trafficking often maintain the following items in their residences: controlled substances and paraphernalia for packaging, weighing, cutting, testing, distributing, and manufacturing controlled substances.

3.     Individuals involved in narcotics trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time, even after the debts are collected. I have found in my training and experience that such records are invaluable to narcotics traffickers and that such records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers, and co-conspirators.

4.     Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics.  Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residences.

5.      Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits.  In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means including: placing assets in the names of other individuals so that they may avoid detection while maintaining control; laundering the money through what appears to be a legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at residences of individuals involved in narcotics trafficking.

6.      Individuals involved in narcotics trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for everyday expenditures and to maintain and finance their ongoing narcotics business. Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residence which were generated by their trafficking activities or purchased with the cash earned from such trafficking. In addition, denominations of $20 bills that comprise the $10,000 in pre-recorded money that was delivered to FITZPATRICK on or about May 26, 2024, is believed to be in the SUBJECT PREMISES, any other residence he has control over and his vehicle.

7.      Individuals involved in narcotics trafficking often maintain weapons, firearms, and ammunition on their person or in their residence and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their narcotics and firearms dealings. In addition, those who illegally traffic in drugs possess firearms to repel attempted

robberies of their drugs or drug proceeds, and deter individuals from attempting to rob them of their drugs or drug proceeds.   In addition, firearms constitute an object of a crime when they are possessed by a convicted felon.

8.      Residences and premises used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting, or controlling the residence and premises.

9.      Individuals involved in narcotics trafficking frequently communicate with co-conspirators by means of cellular telephones and electronic paging devices and usually maintain these items on their person and/or in their residences and vehicles.

10.     Individuals involved in narcotics trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter-surveillance upon law enforcement authorities, and usually maintain these items on their person and/or in their residences and vehicles.

11.     Individuals involved in narcotics trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with narcotics proceeds or property utilized to facilitate narcotics trafficking activities. Such items are typically maintained in their residences. Drug traffickers often store information relating to their drug trafficking business on computers and/or computer disks.

12.     Documents/Records: It is also my opinion and belief that the above-described documents are currently possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by narcotics dealers whether or not the dealer is in possession of any drugs at any given moment. I believe that the

seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found at the SUBJECT PREMISES despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

13.    Cellular Telephones: In this case, there is probable cause that FITZPATRICK utilizes cellular telephones to facilitate his drug trafficking activities. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular telephones today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. Cellular service providers allow for their subscribers to access their device over the internet and remotely destroy all of that data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "airplane mode" which disables access to the network.   Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. Conversations can be hidden in various applications. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or

longer. Consequently, this warrant seeks authorization to seize and secure cellular telephones found at the SUBJECT PREMISES or in FITZPATRICK'S possession and to search or analyze the same off-site by one or more trained examiners.

14.    I believe that the items described in Attachment B will provide evidence of the events set forth in this affidavit and that such articles can be found at the SUBJECT PREMISES despite any lapse of time between the events described and the anticipated search pursuant to this warrant.

Further your Affiant sayeth naught.

Respectfully submitted,

Jonathan Vernon, Task Force Officer
Drug Enforcement Administration

Sworn to me by telephone or other reliable or other reliable electronic means on June 3rd, 2024.

Dwane L. Tinsley
United States Magistrate Judge